The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Our first case for argument today is 20-1044, Wangxiang America Corporation v. United States. Mr. Roll, please proceed. Yes, thank you and good morning, Your Honors. First, I wanted to thank the Court for making these arrangements in these difficult times so that we can proceed. Turning to our argument and our position in this case, the thrust of the decision below is that our client – and by the way, there are some, of course, difficult Chinese names to pronounce. I probably will butcher them, but I'll call my client Wangxiang America or WAC. And there's another company you're going to hear reference, Wangxiang Qinchao or WQC. Just to keep some of the initials clear and straight. Anyway, the Court below said that my client, the importer, Wangxiang America, failed to seek an administrative review and had it done so, it could have availed itself of 1581C jurisdiction. A couple problems with the Court's decision below. The first problem, which we try to emphasize, is that during the time period at issue, the merchandise that we're talking about was not subject merchandise and it's pretty fundamental that an importer can only request a review if it imports subject merchandise. Counsel, this is Judge Toronto. Can I ask, so my understanding, correct me if I'm wrong, that in the powertrain proceeding, the importer there both requested a scope ruling and argued in the scope ruling that its products were not subject merchandise. Why could you not have done the same? Sure. Yes, they do do that. New trend, is that what the importer was called? Yeah, new trend and powertrain were the cases that kind of worked in parallel to resolve a scope issue back in 2010 about whether these wheel hub assemblies were subject merchandise or not. That is correct, and they did do that. I'm not counsel for them, of course. I don't know what prompted them to do that. No, but I guess that seems to me, if I was right about the factual premise, that the requester, or at least in one of those, the requester of the scope ruling was an importer who was simultaneously arguing against coverage, that is, and I assume that that's an available procedural mechanism. Yes, one can avail, just as that importer did, themselves of a scope proceeding, but that's not why the judge below said they didn't have jurisdiction. They said we didn't have jurisdiction or Judge Kassman didn't have jurisdiction because you didn't request an administrative review. So why couldn't you have done that? Wasn't WAC a participant in all of the annual reviews relevant here? I have a question about which ones are relevant, but let's say at least in 2007 to 2011 when these entries were made. Sure. So WAC, just some quick history here, yes, as you pointed out, they did import bearings, true bearings, meaning TRBs, which are black and white in the scope of the order in the 1990s and past, even beyond that. In the late 90s, in the year 2000-2001, they did participate in administrative reviews and Commerce issued to what's called Wansheng Group Corporation a 0% dumping rate or margin. So starting in around the year 2000-2001, their rate was zero for TRBs. They had no reason to believe, again, I don't know what prompted Powertrain and Nutrien and the other importers to get scope ruling requests. Maybe they had an issue with customs. Maybe they just wanted to get clarity. But there certainly was no legal obligation. Chelsea, this is Judge Reno. But isn't that kind of what a prudent importer does when there's doubt or any question as to coverage? You ask for a scope ruling, or you make a test entry, a test shipment, and you enter a small amount of the merchandise and you see what customs is going to do. And then on that basis, you have a wide-open avenue to the CIT. Sure. But I think part of this, Your Honor, is we're looking at this now with the benefit of hindsight. If we put ourselves in the mindset of it's 20,000. Well, not really. But what I just described is common practice, isn't it? It is if there's a doubt, if you have a question, sure. The question would be that I would ask, I mean, I know you're the one who asked the questions, but rhetorically I would ask, why would an importer have a doubt about their product being in scope? For example, Because, and I'll answer the question, because these assemblies have TRBs in them. They have a hub, they have a seal, and the entire assembly seems to act as the outer ring. So wouldn't an importer look at that and go, gee, you know what, we may have a problem here. We're bringing in TRBs and we don't think they're covered, but customers may think they're covered or commerce, so let's go get a scope release. Or let's enter a test shipment and see how that goes. And on that basis, we can either continue importing or we're forced to go to the CIT under 1581C. That's not hindsight. That's common practice. Sure, but again, I go back at the time, and again, this is a company that certainly knows TRBs, and I don't disagree with your factual characterization of how these products, meaning the wheel hub assemblies at issue, have some elements of being a bearing, but they also have four or five other functionalities to them that have nothing to do with being a bearing. And it seems to me, yes, they could have done all of that. There's no question they could have done all of that. The question was, were they required to do all of that? In other words, was it unreasonable for them to say, I believe these are not TRBs? Certainly once commerce makes a notice and says to the world, hey, these are now in scope, I would not disagree from that point forward. Isn't there an affirmative duty on importers to make informed decisions? It is, but the fact that they got it wrong doesn't suggest, to me, doesn't suggest that their decision that they made was unreasonable. They got it wrong. We can't deny that because we have the scope decision from both commerce and later from the powertrain court. We know that they got it wrong. The question is, was it unreasonable what they did? And the law seems pretty clear to me that as long as it was not a – it's not the case where there was no base, like a snow ski being treated as a water ski. This is a product that had four or five other functions that have nothing to do with the bearing reducing friction function, such as converting torque, the ABS functions. And, in fact, commerce itself said in the very proceeding that said these were in scope, the issue is not clear. Mr. Rowe, let me – Oh, go ahead. Okay. Thank you, Judge. Let me ask you this question. Is the penalty investigation ongoing? Yes. Well, if I can be concise, there is a penalty asserted against Wong Chung. There's no more investigation. Okay, but you haven't written a check. You haven't written a check for that. Okay. So let's say that you refuse to write a check or you write a check. Wouldn't you have available to you the right to cause of action under 1581C at that point in protesting the duties that you're being forced to pay? No, it's not entirely clear at this point, Your Honor, that 1580 – the government would bring an action, an enforcement action, to collect the penalty and to collect the duties under 28 U.S.C. 1581C. You could protest at that time, right? No, because there wouldn't be any – there's no protest remedy. If I protest under 19 U.S.C. 1514, there's no ability to protest at that point. The issue would be – Under 1581C. Under 1581C. 1581C, that was limited to decisions of the Commerce Department, and this penalty proceeding or collection proceeding would not be to collect anything the Commerce Department is asserting is owed. It would be what Customs is asserting is owed. But if the government brought an enforcement action under, what is it, 1592, then you could, among other things, at least argue against the penalty portion of this – of the demand on the ground that what you – the course you chose, though perhaps wrong, you chose reasonably. Is that right? That is certainly correct. But the Sackett case teaches that the remedy we have from dealing with Customs in the penalty case, which is what you're asking about, we shouldn't have to say that the remedy we have with a different agency is a cure to the remedy with Commerce. The issue here is Commerce's decision and how it was interpreting WGC, which is what – who had determined the 0 percent rate. Can I ask you a question about the case law that says 1581I is not available where one of the earlier subsections is available here, 1581C. Have we said that even if, for example, 1581C was available, nevertheless, if it was reasonable not to pursue the 1581C course, then 1581I is available? Because you have – I had thought, and just tell me if I'm wrong, that the – our law about the relation between C and I does not build in a reasonableness assessment of the availability of C. If it was available, then I is not. Well, I would point, Your Honor, to, I believe, the Suntec decision where there was a question about a Chinese exporter who claimed they never got notice of an administrative review, so they could have participated in the review, but they did not. And I believe Your Honor authored the opinion in that case, stating that for jurisdictional purposes, which is all we're talking about here, they assumed that all the facts were true, that they never got served, even though they could have participated. Okay. Can I just double-check one fact? When were the entries at issue here liquidated, or at least by what date were they liquidated? Sure. So the entries were made, just to clarify, entry date versus liquidation date. The entries at issue are from October 2007 until September 30, 2012. That's what the bill is for, for that time period. Those are the entries. The liquidation dates would be about 10 months after those dates. So the latest liquidation date would be in about 10 months from September 2012, which puts us at about July of 2013. Okay. So a bunch of these were not liquidated until, sounds like substantially more than a year after February 21, 2012, when the powertrain scope ruling of Commerce came out. Correct. And all the entries of the ones where Customs said we owed money, the specific entries they reviewed, they were all before February 2012. And then they would have liquidated afterwards. I mean, Customs could have suspended liquidation here when they were doing the audit. They chose not to. Okay. Counsel, why don't we save the remainder of your time for rebuttal, and let's hear from Mr. Ciccini. Thank you. Good morning, and may it please the Court. I think the most important observation from the last 10 minutes is that the standard that the Court applies when determining whether jurisdiction is available under its residual provision is whether there was a remedy under one of the earlier subsections, and whether that remedy was not manifestly inadequate. Now, WAC has not argued that the remedy under 1581C was manifestly inadequate. The company is only arguing that the remedy that the CIT pointed to was not a scope ruling but participation in one of the annual administrative reviews. To determine that WQ was like its affiliated corporations independent of the Chinese government. Absolutely. That's the important thing to keep in mind. If you go back to the complaint, and the case is somewhat more now into a question as to whether the importer was reasonable. But if you go back to the complaint, what WAC is asking for is a determination from the Court that WQ, another affiliated company, was independent of Chinese government control. And all that the Commerce Department did here was advise CBP that it had never actually looked at WQ itself as an exporter. And that's a fact that nobody can test in this case. And that's really important because the remedy was always there to look at WQ as an exporter for the company either to make test shipments and for commerce to determine whether, first of all, whether that company was free of government control. And second, to determine if it were free of government control to determine the rate of dumping. Can I just add another perhaps quite minor point? The CIT when discussing the administrative review remedy seemed to talk about the administrative reviews in 1994 to 2001. Since we're talking about entries between 2007 and 2012, aren't the relevant administrative reviews the ones for those years? Yes, but I don't think the trial court foreclosed those particular reviews. I think if WAC had identified WQ as an exporter in those earlier reviews or once it began exporting in, say, 2007, if the company had then asked for a review, the company would have had an adequate remedy. Commerce would have determined whether WQ was part of the China-wide entity and that result would have applied to all of the imports at issue in this case. Can you address the kind of doctrinal question that I asked Mr. Rohl? In our case law about the relation between 1581C and 1581I, is there a role for answering for the question even if C was available, was it reasonable for the now plaintiff in an I action to have bypassed the C remedy? No, there's no reasonableness requirement. First of all, the court would have to look at the state of mind of the plaintiff at the time of the relevant activity, which of course would open a whole new morass. And second, to the extent there is any reasonableness, it would go to the second prong of the analysis, which would be whether the remedy under the alternative subsection would have been manifestly inadequate. And if you look at one of the footnotes in Judge Katzen's opinion, he noted and nobody contests that WAC never argued that its remedy under C would have been manifestly inadequate. It could have gotten exactly the determination that it asked for in an administrative review that WQ is not controlled by the Chinese government. Counsel, can I ask, this is Judge Moore, do you believe that we have to decide whether or not this CLU memo is a final agency action? No, the court doesn't need to decide that in this case because the C versus A question would dispose of the case, as would, on the basis of rightness, the court could likewise affirm. But, you know, turning to that issue, there's no reversible error here in the court's determination that there was no final agency action. If you go to our brief when we talk about the relevant cases out there, you know, that, for example, the Corps of Engineers, the Hawks case, there's no action that altered the legal relationship between WAC and the United States because WQ had been part of the China-wide entity, presumptively going back to the issuance of the order in the 1980s. This court's decision in SGMA makes that abundantly clear. And another important thing to look from the SGMA opinion, which moves back to the availability of a remedy under C versus A, is that just because a company, an exporter, is affiliated with a company that's independent of Chinese government control, that affiliate is still presumed to be part of the China-wide entity unless it proves that it's separate from Chinese government control. So, really, the C versus A question can be disposed of by a straightforward application of SGMA here. Counselor, this is Judge Rand. Looking at the CLU memo, it appears to me, and tell me if I'm wrong, but it appears to me that what it does, it just provides a historical summary of the administrative reviews and the results of them and the participants in those reviews. It didn't add any new facts or subject matter. It didn't make any findings, I'll put it that way. Is that correct? That's absolutely true. It's just recounting what happened. Okay. And can I just follow up on that? And what is the logical consequence of that characterization for the question of final agency action or its cousin, rightness? Well, it never altered the legal relationship of the parties because WQ, the exporter, was always part of the China-wide entity, going back to the last time that one of the Wangsheng Group companies was reviewed. But I guess I'd understood WAC's argument to be that when commerce answered the question by recounting the, I think, undisputed history, at that point CBP was bound to determine that WQ was subject to a 92% rate. I wouldn't say that it was bound to make that determination. Turning to the rightness issue, assuming that the current proceeding before CBP ripens into a referral to the Justice Department and we file a complaint against the importer, the importer has the right to a trial de novo. It's not going to have a right to prove that the exporter was free of Chinese government control, but it will have the opportunity to prove that the Commerce Department was wrong and that WQ actually was reviewed. If it were to do that, it would be a very different case. And that's the sort of evidence that is available at the Commerce Department for parties who want it. And it's also available, certainly, to affiliated companies of the plaintiff in this case. Counsel, would it make any difference to your case if I viewed WAC's challenge to Commerce's clarification of prior ambiguous administrative rulings rather than just challenging entitlement to WGC's rate? I don't think it would make a difference here because you need to look at the true nature of a determination to assess jurisdiction. And there was no final determination that really came out of it. If you look at the CLU memo itself, all it really says is we reviewed exports that were produced by companies A and B and C. Isn't that going beyond what we would normally do in a jurisdictional assessment? Isn't that sort of better for the CFC to do in the first instance? The trial court did look at the memo, and the plaintiff here was certainly free to provide any evidence, any jurisdictional facts that it had in its possession, but it did not. So, yes, that is the sort of thing, determining jurisdictional facts that the trial court should generally do. And the trial court did that based on the record made before that court. Can I ask you, in a 1592 enforcement action, I think you said that – well, I'm trying to figure out what issues would be litigable by WAC. So would the issue of WQ's independence from the Chinese government be litigable? I think you said the answer is no, right? We believe the answer is no. And I don't think – I think I heard Mr. Rohl say that he views the question of generation 2 and 3's coverage by the anti-dumping duty order as settled, so that that doesn't actually seem to be an issue anymore. But one aspect might be, and I want to know whether you think this is litigable, and that is whether the February 21, 2012 scope ruling in the powertrain decision could be applied or whether it would be inconsistent with 351.225 to apply it to entries that were made before that date without a suspension of liquidation. And, no, we don't think that the regulation would cause any issues. But could they litigate that question in the 1592 proceeding? I think they could litigate it in the context of reasonableness. And if the importer demonstrates that it acted reasonably, that's a complete defense. It's not only a defense to penalties, as Your Honor noted. It's a complete defense to lost revenue as well. Ah, okay. And I didn't know. Thank you. So if the, under 19 U.S.C. subsection, 1592G, so that's where the whole question of the application of the regulation might go into force. If the importer were to demonstrate that it acted reasonably at the time because it, for some particular reason, then it would have a complete defense. On the other hand, products in this case, commerce had previously determined that they fell under the unambiguous language of the anti-dumping duty order. And those are countervailing factual issues that the trial court would have to determine in the first instance. Okay. Counsel, I think we have your argument. Mr. Rohl, you have a few minutes of rebuttal. Thank you. Yes. Thank you. Thank you. With regard to 1581C jurisdiction, before I comment on the final agency action discussion that was just taking place, I'm still stuck how we get past the fact that in 2007, for example, the beginning of the audit period, the merchandise at issue was not scope merchandise, or subject merchandise, rather. It would have been impossible to request an administrative review for 2007 or 2008 or 2009. Yes, to Judge Raina's question, could they have asked for one? Could they have done it? With hindsight, should they have done it? We can say with hindsight, yes, they should have. The question is, were they legally obligated to? Was there anything wrong legally with the way they declared their entries? And the answer to that has to be no. There's no legal requirement until the scope ruling comes out to treat your merchandise as being subject merchandise. If you don't have subject merchandise, we could not have done a review for the 2007, 2008, 2009, 2010, 2011 time periods. It just cannot be. Turning to the question of final agency action and the May memo that we're challenging, the May 2016 memo, the exhibit, if you have that, that's at Joint Appendix page 64 that I'm referring to. Sorry for my voice. It's failing me now. It talks about this note that was put into ACE. If one were to search, if the court were to search, of course, it's our job to educate the court, but what I'm about to say can be confirmed. Every Federal Register notice that Commerce ever put out in the administrative reviews involving our client involved the rate for WGC, Wanshan Group Corporation. Why was it necessary in 2013 to put this note in ACE and to make a determination? If you read the language of the note, it says this information, the last sentence, this information was determined based on a questionnaire response. Commerce very much defined in this May memo who WGC is, what they consider it to be. The reason we believe we have jurisdiction, and we may be wrong at the end of this on the merits, it's possible, we don't believe we are, but the court has to examine the substance of what Commerce did here. Was it really just reporting the news where they said, hey, in these old reviews, we determine rate of X for this company and Y for the other company, or was Commerce interpreting to say WGC means this? On joint appendix page 60, which is part of the May memo, they talk about in the last full kind of big paragraph, last sentence says, none of these documents clearly identify WQ as being a manufacturer or exporter. Again, clearly. How clear was it? That's something for the court to decide. Again, maybe the court, when it reviews the record in this case, which is all we're asking for, will decide that, yes, that was clear. I see I'm out of time. If I could just make one last quick point, and then I'll wrap it up. Go ahead. In that same paragraph, Commerce itself says that in the review period for 98 to 99, WQ, which is the company we're saying should get the zero rate as well, was, and this is a quote, a stock company that handles all of the manufacturing of the group. So to say there's no evidence on the record that WQ was the producer of the merchandise is simply false and contradicted by Commerce's own document. I realize I'm out of time, and I thank you for listening. I thank both counsel. This case is taken under submission.